## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| MATRIX IV., INC. | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 06 C 1661 |
| v. | ) |
| | ) |
| AMERICAN NATIONAL BANK AND | ) Honorable Charles R. Norgle |
| TRUST COMPANY OF CHICAGO, and | ) |
| GATEWAY PARK LLC, | ) |
| | ) |
| Defendants. | ) |

### OPINION AND ORDER

CHARLES R. NORGLE, District Judge

This action is Plaintiff Matrix IV, Inc.'s ("Matrix") latest attempt to recover

approximately $6 million from the debtor S.M. Acquisition Co. d/b/a Stylemaster, Inc.

("Stylemaster" or "Debtor"). Stylemaster filed for bankruptcy in 2002. To recover the funds

that Stylemaster owed to it, Matrix pursued equitable and other relief in the bankruptcy court, in

the district court on appeal and in the Seventh Circuit Court of Appeals. Matrix lost at all levels.

Undeterred, Matrix filed a separate complaint in this Court to recover from the Defendants

American National Bank and Trust Company of Chicago ("ANB") and Gateway Park LLC

("Gateway") (collectively "Defendants") under theories of fraud and the Racketeer Influenced

and Corrupt Organizations Act ("RICO"). Matrix contends that the Defendants participated in a

scheme perpetrated by Stylemaster to fraudulently induce Matrix to produce goods for which

Stylemaster had no intention to pay, so that Stylemaster could build up its inventory, and then its

successor company, J.R. Plastics, LLC, could purchase the inventory at firesale prices during

Stylemaster's bankruptcy proceedings.

Before the Court is Defendant ANB's Motion for Judgment on the Pleadings, filed by its successor, JP Morgan Chase, N.A. ("Chase"), and Gateway's Motion to Amend the Court's March 14, 2008 Order (the docket entry to which Gateway refers is dated March 11, 2008). The Defendants' motions assert that Matrix's claims are barred either by the doctrines of *res judicata* and collateral estoppel, or by the applicable statute of limitations. In support, the Defendants maintain that the courts' decisions throughout the prior bankruptcy proceedings preclude Matrix from pursuing its claims against the Defendants in this Court. For the following reasons, the motions are granted.

## I. BACKGROUND

### A. FACTS

The following facts are taken from Matrix's Amended Complaint, from Chase's Answer and from all public records and proceedings to which the parties refer and of which the Court has taken judicial notice.

Stylemaster was incorporated on May 6, 1994 for the purpose of purchasing and distributing plastic storage containers. To meet the company's retail demands, Stylemaster typically employed two distinct outside vendors – one to manufacture plastic injection molds (the "broker") and one that used the plastic injection molds to manufacture the plastic storage containers that Stylemaster sold (the "supplier"). Matrix was one of Stylemaster's suppliers. In a typical exchange between Stylemaster and Matrix, Stylemaster first ordered plastic injection molds from a given broker. The broker then designed and manufactured the molds for Stylemaster, sometimes engraving Stylemaster's logo onto them. After that, the broker shipped the molds directly to Matrix's manufacturing plant, where Matrix manufactured plastic storage containers for Stylemaster, who, in the end, sold them to retailers. At one time Matrix possessed

2

sixty-two molds that Stylemaster ordered from outside brokers and had shipped directly to Matrix's manufacturing plant.

As alleged, Stylemaster routinely failed to make full or timely payments to its suppliers, including Matrix. As of November 6, 1997 Stylemaster owed Matrix approximately $2,400,000, which Stylemaster paid back by the end of December 1999. But Stylemaster still owed Matrix for work performed after November 6, 1997. In light of this, Matrix sent letters to Stylemaster's CEO, Martha Williams ("CEO Williams"), claiming that Matrix held possessory liens in the molds that Matrix had in its possession. Moreover, to ensure the parties' continued relationship, Matrix demanded that Stylemaster acknowledge Matrix's possessory liens as superior to all others. When Stylemaster agreed, Matrix found these assurances sufficient and chose not to record its purported liens with the Illinois Secretary of State. Rather, Matrix asserted its liens pursuant to the Illinois Tool and Die Lien Act, 770 ILCS 105/1. Over time, Stylemaster's debt continued to increase and Matrix eventually refused to continue working with Stylemaster.

To secure the relationship, Stylemaster assured Matrix that Matrix had the first priority lien in the molds in its possession and that Stylemaster had ceded control of its operations to a reputable company that would increase Stylemaster's liquidity and profitability, while working to decrease the company's debt to suppliers. Stylemaster also presented Matrix with the following condition – that it would receive payment for all prior shipments, but only if Matrix agreed to satisfy Stylemaster's product requirements for the upcoming years. Otherwise, CEO Williams informed Matrix that she would put the company in bankruptcy and that, consequently, Matrix would not receive any past due payments. Matrix agreed to meet Stylemaster's product requirements based on these representations.

3

As to Stylemaster's finances, ANB served as the company's primary lender. On November 3, 1997 Stylemaster obtained a significant line of credit with the bank. In that regard, Stylemaster and ANB executed a loan agreement and a security agreement, which, from time to time, the parties amended. On November 6, 1997 ANB filed with the Illinois Secretary of State a Uniform Commercial Code financing statement (the "Financing Statement"), which provided a "Description of Collateral" that Stylemaster put up to secure the loan. According to the Financing Statement, ANB asserted a security interest in:

> All of [Stylemaster's] tangible and intangible assets and property, whether now or hereafter existing and whether now or hereafter owned...including, without limitation, all of [Stylemaster's] (a) accounts,..., and general intangibles, (b) ...securities, (c) goods, including, without limitation, all of [Stylemaster's] consumer goods, equipment, fixtures and inventory...(g) property now or at any time or times hereafter in the possession or under the control of Secured Party or its bailee...and (j) and [sic] all proceeds and products of any of the foregoing....

On November 30, 2001 Stylemaster and ANB entered into the "Seventh Amendment to Loan Documents," which substituted into the parties' security agreement the following language: "Borrower,...hereby grants the Bank a security interest in...Borrower's tangible and intangible assets and property wherever located." The validity of ANB's security agreement with Stylemaster and the validity of Matrix's priority liens were directly at issue in the bankruptcy proceedings. But Matrix alleges that ANB earlier became wrapped up in what Matrix calls the "Build Up and Bust Out Scheme" that Stylemaster carried out. Matrix refers to other, ancillary schemes in its Amended Complaint – the inventory scheme, the mold scheme and the lien scheme – but the ultimate goal as to all of them was to support and further the primary "Build-Up and Bust-Out" scheme.

In 1998 CEO Williams, Michael DePaul ("DePaul") and William Bailes ("Bailes"), Stylemaster's primary investors, formed a related company, Gateway Park LLC, and entered into

4

negotiations with the City of Chicago to develop an industrial park, or "Gateway Park," located at 77th Street and Columbus Avenue on the city's southwest side. The plan called for the construction of a 660,000 square foot industrial space for Stylemaster, a 750,000 square foot industrial space for lease to tenants and certain related public improvements. CEO Williams and others represented to Matrix that after Stylemaster moved into its new industrial space in Gateway Park, it would continue to purchase from Matrix just as many if not more plastic products for its retailers. Matrix thus expanded its business operations to meet Stylemaster's upcoming demands, unaware, however, that the success of the Gateway Park project depended on the Defendants' ability to defraud Matrix and Stylemaster's suppliers, and that Gateway was the intended beneficiary of all illicit profits that would be obtained through the Defendants' wide-scale scheme.

Beginning in late 2000, the "Build-Up and Bust-Out" scheme, according to Matrix, would work as follows. Stylemaster first planned to build up a significant inventory in plastic products and to delay or refuse payment to its suppliers. Using the inventory, Stylemaster would increase its line of credit with ANB and then misuse the new, larger line of credit to acquire the capital equipment necessary to move the production of Stylemaster's plastic goods in-house. Stylemaster and related companies, including ANB, would also destroy the possessory liens in the many plastic molds held by Stylemaster's suppliers, namely Matrix. In the end, Stylemaster would be put into bankruptcy so that its successor company, J.R. Plastics, could purchase Stylemaster's assets and inventory at a fraction of the market value.

In 2001, to put the scheme into play, Stylemaster allegedly placed with Matrix a number of large, out-of-the-ordinary orders for plastic products, purportedly to fill bona fide orders from the company's retailers. When Matrix inquired about the unusual orders, Stylemaster

5

represented that the orders were for actual customers and that Stylemaster's Gateway facility had plenty of storage space for any extra inventory because the company had been busy filling significant orders on behalf of its retailers, including Kmart. On a number of occasions, starting in late 2001, CEO Williams allegedly contacted Matrix and suggested that it fill Stylemaster's outstanding orders as soon as possible because Kmart was planning certain sales initiatives that required new and large orders. Matrix thus operated on an expedited basis to meet Stylemaster's considerable demands.

In December 2001 Kmart allegedly cancelled most of its outstanding orders with Stylemaster. Nevertheless, in January 2002, without informing Matrix of Kmart's cancellation, CEO Williams and others continued to demand that Matrix fill all outstanding orders as soon as possible. Beyond that, Stylemaster allegedly placed two substantial orders with Matrix for a total of $2,828,000 in plastic goods. Throughout the scheme, Matrix extended credit to Stylemaster for its purchases and, as alleged, the products that Matrix shipped to Stylemaster were not sent to the company's retail customers, but instead Stylemaster placed the products in its inventory. On January 22, 2002 Kmart filed a bankruptcy petition seeking relief under Chapter 11.

On February 22, 2002 Matrix filed a complaint against Stylemaster and Williams. In March of that year Matrix filed a proof of secured claim under the Illinois Tool and Die Act for approximately $6.6 million. On March 18, 2002 Stylemaster filed for a voluntary petition under Chapter 11 in the United States Bankruptcy Court for the Northern District of Illinois. As of the petition date, Stylemaster owed ANB over $9.5 million. Matrix alleges that at the time it filed for bankruptcy, Stylemaster owed Matrix approximately $7.2 million. Shortly after Stylemaster filed for bankruptcy, CEO Williams and her associates formed J.R. Plastics, LLC ("J.R.

Plastics"). During an asset sale conducted and approved by the bankruptcy court on March 20 through March 22, 2002, J.R. Plastics purchased substantially all of Stylemaster's assets, including the company's inventory. On May 3, 2002 ANB agreed to assign to J.R. Plastics its secured interest and liens on the sixty-two molds in Matrix's possession.

## 1. Matrix Objects to the Section 363 Sale in the Bankruptcy Court

On April 22, 2002, after the sale hearing, the bankruptcy court issued an "Order Authorizing S.M. Acquisition Co. D/B/A Stylemaster, Inc. to Sell Assets and to Assume and Assign Certain Executory Contracts and Unexpired Leases," in which the bankruptcy court overruled all objections from Stylemaster's suppliers, approved the sale to J.R. Plastics as good faith purchasers and found that ANB held a first perfected priority lien and security interest on all of Stylemaster's assets, other than the equipment subject to unresolved liens claimed by Matrix. Def.'s Memo., Ex. 3. On May 3, 2002 Matrix filed a motion to reconsider the bankruptcy court's April 22, 2002 Order. Def.'s Memo., Ex. 2. There Matrix challenged the bankruptcy court's finding of good faith on behalf of the purchaser, J.R. Plastics, arguing that J.R. Plastics "was a part of the fraud" alleged in Matrix's counterclaim against Stylemaster and its two principles. Id. ¶¶ 8-10. The fraud alleged in Matrix's counterclaim was a familiar one – "that the defendants were engaged in an unlawful and fraudulent scheme whereby they induced Matrix to deliver goods to Debtor even through defendants had no intention of paying for the goods" and that "defendants intentionally stockpiled Matrix inventory, and then sought protection under the Bankruptcy Code so that they could, under the guise of a new corporate identity (JR Plastics), purchase the Debtor's assets, including the inventoried goods, as well as millions of dollars in receivables, for a fraction of the market value." Id. ¶ 9. Based on

allegations of fraud similar to those outlined above, Matrix insisted that J.R. Plastics was not a good faith purchaser of Stylemaster's assets. See id. ¶¶ 11(A) – 11(O), 12.

The bankruptcy court held a hearing on Matrix's motion for reconsideration on May 6, 2002. At the hearing Matrix's counsel explained that there is evidence in the record that supports a finding of fraud and collusion on behalf of Stylemaster's principals, who also own and manage the purchaser, J.R. Plastics. See Def.'s Memo., Ex.4, Hr'g Tr. at 23. Matrix argued that in light of the fraudulent conduct the bankruptcy court failed to include in its April 22, 2002 Order specific findings of fact on whether J.R. Plastics qualified as a good faith purchaser. And, after allowing the parties to briefly supplement their paper submissions with a few oral statements, the bankruptcy court issued its ruling. The bankruptcy court recounted Matrix's arguments with regard to the alleged fraudulent scheme, id. at 36-37, but ultimately found that "Matrix has not shown or alleged any evidence of fraud or collusion in the bidding" process. Id. at 37. In fact, the court said, "it is quite commonplace and involves no necessary impropriety for a debtor to bid at a foreclosure sale." Id. The court in the end denied Matrix's motion to reconsider. Id. at 45; Def.'s Memo., Ex. 5.

## 2. Matrix's Equitable Subordination Defense in the Bankruptcy Court

In addition to Matrix's objection to the sale of Stylemaster's assets, a dispute arose during the bankruptcy proceedings as to whether ANB was entitled to a first-priority lien on Stylemaster's property, including the molds that Matrix had in its possession. Matrix, as expected, contested ANB's priority lien. ANB therefore filed an adversary complaint against Matrix, seeking injunctive relief and a declaration that its lien on the molds in Matrix's possession was superior to any lien that Matrix allegedly held. Matrix answered ANB's complaint, and eventually the parties filed cross-motions for summary judgment. In its response

8

to ANB's motion, Matrix argued that ANB's security interest in Stylemaster's molds should be equitably subordinated to Matrix's tool and die lien, because ANB had participated in "illegal conduct" and colluded with Stylemaster to prosecute its liens to Matrix's detriment. Def.'s Memo., Ex. 7, Matrix's Memo. in Resp. to Summ. J., ¶¶ 26-29.

To support this argument, Matrix submitted a long list of ANB's alleged underhanded conduct, which included, among other things: extending credit to Stylemaster despite the company's insolvency; intentionally ignoring Matrix's liens; failing to use reasonable efforts to identify and resolve non-UCC liens, such as those asserted by Matrix; entering into a settlement agreement with Stylemaster's guarantors to spoil Matrix's equitable subordination defense; and having its attorneys assert an attorney-client privilege to bar inquiry into ANB's and J.R. Plastic's attempts to "penetrate" Matrix's liens. Id. ¶¶ 29(a)-(l), 31(a)-(e). In light of this "collusive conduct by the Bank," Matrix requested that the bankruptcy court equitably subordinate ANB's liens and, ultimately, deny ANB's motion for summary judgment. Id. ¶ 32.

The bankruptcy court denied the parties' cross-motions for summary judgment. ANB then sought to strike Matrix's equitable subordination argument by filing a motion in *limine* informing the bankruptcy court that Matrix failed to properly plead equitable subordination as an affirmative defense. On November 14, 2002 the bankruptcy court ordered Matrix to file a more definite statement of facts to support its defense and stated that it would treat ANB's motion in *limine* as a motion to strike. Matrix complied with the bankruptcy court's order and submitted a detailed statement that outlined ANB's purported "collusion" with Stylemaster. For instance, Matrix alleged in its statement:

> The Bank had actual or constructive knowledge of Matrix' lien claims upon Stylemaster's molds and, specifically, any lack of knowledge was directly attributable to the Bank's intentional choice not to abide by its policy to use

9

> reasonable efforts to identify and address common law liens in connection with the granting of a revolving line of credit to Stylemaster....

Def.'s Memo., Ex. 10 ¶ 4. Matrix further alleged that ANB never sought information from it regarding the ownership of the molds in Matrix's possession, which eventually would serve as part of the underlying inventory and collateral for ANB's line of credit. Id. ¶¶ 13-14. Moreover, according to Matrix's statement, ANB failed to confirm the existence of Matrix's tool and die liens on Stylemaster's molds, despite the company's policy to conduct due diligence as to non-UCC liens. Id. ¶¶ 24-25, 29(B). ANB neither communicated with nor investigated Matrix to determine whether it had liens on Stylemaster's property. Id. ¶ 33. Further, as part of the alleged collusion, Stylemaster's owners bolstered ANB's financial interest in Stylemaster by executing a pledge agreement that allowed ANB to gain significant control over company's collateral and to, in essence, purchase an equity position in Stylemaster. Id. ¶¶ 35(a) – (k), 38-41. Matrix, however, was left in the dark as to ANB's alleged dealings with Stylemaster. Id. ¶ 42-43. After several amendments to the parties' security agreement, Stylemaster, who was now insolvent, continued to purchase various molds for its in-house production plans, using its working capital and the bank's line of credit, while it continued to avoid paying its suppliers. Id. ¶¶ 55-57.

On December 20, 2002 the bankruptcy court announced in open court that ANB's motion to strike Matrix's equitable subordination defense ("Eighth Defense") would be granted when the court completed its opinion. For various reasons, the bankruptcy court delayed the entry of an opinion on the motion to strike the Eighth Defense, and, following certain appeals, the case was remanded for entry of an order and opinion on the motion to strike. The bankruptcy court entered that order on October 31, 2005, finding that Matrix's proposed evidence failed to set forth any ground on which subordination relief can be granted, which we discuss more fully below. In Re S.M. Acquisitions Co., 332 B.R. 346 (N.D. Ill. 2005). Matrix appealed the

judgment to the district court and, on April 7, 2006, the district court affirmed the bankruptcy court's order striking Matrix's equitable subordination defense. In Re S.M. Acquisition Co., No. 05 C 7076, 2006 WL 2290990, at *1 (N.D. Ill. Aug. 7, 2006). Likewise, the Court will address the district court's ruling in more detail below. Matrix next moved for entry of a final appealable order and to vacate all prior judgments in the related cases. Def.'s Memo., Exs. 19, 21. The district court, on May 9, 2007 and on August 16, 2007, respectively, denied Matrix's motions because the court lacked jurisdiction to entertain them. Id., Ex. 19, 22.

Matrix, in the end, filed consolidated appeals in the Seventh Circuit and moved to vacate all prior judgments in the related cases and to dismiss ANB's lien rights claims with prejudice. Id., Ex. 20. On appeal Matrix challenged ANB's standing to prosecute its lien rights in Stylemaster's molds, since ANB assigned those rights to J.R. Plastics. From there, Matrix goes on with ancillary matters that do not concern us here. On January 9, 2008 the Seventh Circuit summarily affirmed the district court's order of May 9, 2007, and on February 1, 2008 the Seventh Circuit summarily affirmed the district court's order of August 16, 2007.

## B. PROCEDURAL HISTORY

Matrix filed its initial complaint in this Court on March 24, 2006, seeking relief from ANB and Gateway pursuant to common law fraud and RICO. To show a pattern of racketeering activity, Matrix alleged that:

> In and after early 2001 and through 2005 the pattern...included but was not limited to discrete but related schemes that extorted additional trade credit; fraudulently misappropriated inventory, molds and various possessory liens in same; and, finally, ANB's ongoing prosecution of claims that its UCC based lien rights were superior to the possessory lien rights of Matrix and other trade creditors.

Compl. at 1, Intro. Both ANB and Gateway moved to dismiss the complaint, and on March 15, 2007 Judge Marovich of the Northern District of Illinois granted the Defendants' motions, citing

Matrix's failure to plead any misrepresentations made by the Defendants and, among other things, Matrix's failure to plead activities that constitute a RICO enterprise.

Matrix filed an amended complaint on May 8, 2007. The Defendants again filed respective motions to dismiss and Gateway additionally filed a motion for summary judgment, asserting the statute of limitations defense. Eventually the case was transferred to the Court's current docket. On March 11, 2008 the Court granted Matrix's motion to conduct discovery and thereafter struck Gateway's outstanding motion for summary judgment. That same day, the Court denied Defendants' motions to dismiss, noting generally that Matrix properly addressed the concerns that the prior judge outlined in his March 15, 2007 Opinion and Order. Yet, as Gateway pointed out in its motion to alter the Court's judgment, the Court did not discuss whether Matrix's fraud claims have already been adjudicated and dismissed under the doctrines of *res judicata* or collateral estoppel. Accordingly, the Court will now address the issues raised in Gateway's motion to alter the Court's denial of its motion to dismiss. Meanwhile, on May 30, 2008 ANB filed a motion for judgment on the pleadings, also moving to dismiss the action on *res judicata* and collateral estoppel grounds. Both motions are fully briefed, and the Court shall decide them concurrently.

## II. DISCUSSION

### A. STANDARD OF DECISION

Once the parties have filed a complaint and answer, a party can move under Rule 12(c) for a judgment on the pleadings, which the Court reviews under the same standard as a motion to dismiss. Pisciotta v. Old Nat'l Bancorp, 499 F.3d 629, 633 (7th Cir. 2007). Under that standard, a complaint must provide notice of the claims and the grounds upon which they rest, and must contain sufficient allegations, based on more than speculation, to state a claim for relief that is

12

plausible on its face. St. John's United Church of Christ v. City of Chicago, 502 F.3d 616, 625 (7th Cir. 2007) (citing Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1964-65 (2007)); EEOC v. Concentra Health Serv., Inc., 496 F.3d 773, 776 (7th Cir. 2007). The Court must still accept as true the factual allegations contained in the complaint and draw all reasonable inferences in favor of the non-moving party. St. John's, 502 F.3d 625; R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Eng'rs, 335 F.3d 643, 647 (7th Cir. 2003).

A court may rule on a Rule 12(c) motion for judgment on the pleadings based on a review of the pleadings alone. N. Ind. Gun & Outdoor Shows, Inc. v. City of South Bend, 163 F.3d 449, 452 (7th Cir. 1998). The pleadings include the compliant, the answer, and any written instruments attached as exhibits, such as affidavits, letters, contracts, and loan documentation. Id. at 452-53. In ruling on a motion for judgment on the pleadings, "the district court may take into consideration documents incorporated by reference to the pleadings" and "may also take judicial notice of matters of public record." United States v. Wood, 925 F.2d 1580, 1582 (7th Cir. 1991). If the court considers matters outside the pleadings, however, the court should convert the motion for judgment on the pleadings into a motion for summary judgment. N. Ind. Gun & Outdoor Shows, Inc., 163 F.3d at 453 n.5.

As affirmative defenses, claim preclusion and collateral estoppel are properly raised on a motion for judgment on the pleadings. Forty One News, Inc. v. County of Lake, 491 F.3d 662, 664 (7th Cir. 2007). When a defendant raises claim preclusion as an affirmative defense and it is clear from the complaint's face and from matters of which the district court can take judicial notice that plaintiff's claim fails as a matter of law, then dismissal on a motion to dismiss for failure to state a claim upon which relief may be granted is appropriate. Gann v. William Timblin Transit, Inc., 522 F. Supp. 2d 1021, 1026 (N.D. Ill. 2007).

## B. *RES JUDICATA* (CLAIM PRECLUSION)

Gateway's primary objection to Matrix's amended complaint is that it repackages the events surrounding the underlying bankruptcy proceedings into a variety of "schemes" in which the Defendants were allegedly involved. For instance, Gateway asserts that Matrix repackaged the events surrounding the judicial sale of Stylemaster's inventory as the alleged "Bust Out Inventory Scheme," and recharacterized ANB's enforcement of its prior recorded liens as the "Bust Out Mold/Lien Scheme." According to Gateway, Matrix's primary goal in filing the current complaint, with its repackaged claims, was to assert a collateral attack on the bankruptcy court's orders regarding Stylemaster's judicial sale and ANB's adversary proceeding.

ANB takes the same approach, claiming that Matrix's amended complaint "is a blatant attempt to relitigate issues that could have been and actually were litigated in [the] prior bankruptcy proceeding, and to nullify final judgments of the bankruptcy court." Def.'s Memo. at 1. In support, ANB avers that Matrix's claims based on any alleged fraud could have been raised either in the underlying sale proceeding or in the underlying adversary proceeding, and therefore *res judicata* bars Matrix from raising its fraud claims here.

In the Seventh Circuit, "a final judgment on the merits rendered by a court of competent jurisdiction acts as a bar to a subsequent suit between the parties involving the same cause of action." In re Dollie's Playhouse, Inc., 481 F.3d 998, 1001 (7th Cir. 2007). Such is the doctrine of *res judicata*, or claim preclusion, which prevents parties from relitigating claims that were or could have been raised in a previous lawsuit that resulted in a final judgment on the merits. Highway J. Citizens Group v. U.S. Dep't of Transp., 456 F.3d 734, 741 (7th Cir. 2006). To establish the bar of *res judicata*, the party asserting it must demonstrate: (1) the identity of the parties or privies in both the prior and subsequent suits; (2) the identity of the cause of action in

14

the two suits; and (3) a final judgment on the merits in the prior action. Cole v. Bd. of Tr. of the Univ. of Ill., 497 F.3d 770, 772 (7th Cir. 2007); Anderson v. Chrysler Corp., 99 F.3d 846, 852 (7th Cir. 1996). If these elements are proved, "res judicata 'bars not only those issues which were actually decided in a prior suit, but also all issues which could have been raised in that action.'" Highway J Citizens Group, 456 F.3d at 741 (quoting Brzostowski v. Laidlaw Waste Sys., Inc., 49 F.3d 337, 338 (7th Cir. 1995)). Bankruptcy judgments are final orders for purposes of *res judicata*.

In this case, the Court can readily resolve the first requirement for *res judicata* purposes. First, Matrix does not contest that the parties are identical. Second, the parties to this complaint, ANB, Matrix and Gateway, are the same parties that were involved in either the disputed 363 bankruptcy sale proceedings or the adversary proceedings in the bankruptcy court, and thus are identical for purposes of *res judicata*. With this in mind, the Court must determine whether the two proceedings involve identical issues that were actually decided on the merits or could have been raised in the bankruptcy court. The Court shall discuss each of these questions in turn.

### 1. Identical Claims

On this point, the inquiry is rather broad. It is well-established that "[a] claim has identity with a previously litigated matter if it emerges from the same core of operative facts as that [in the] earlier action." Cole, 497 F.3d at 774 (citing Highway J Citizens Group, 456 F.3d at 741). The inquiry does not call for an exact match. Rather, if the evidence required to support the two claims at issue is "nearly identical," the claims will be found to share the requisite closeness to qualify for *res judicata* preclusion. Herrmann v. Cencom Cable Ass'n, Inc., 999 F.2d 223, 226 (7th Cir. 1993); see Atkins v. Hancock County Sheriff's Merit Bd., 910 F.2d 403,

404-05 (7th Cir. 1990) (noting that a more exacting standard would "invite piecemeal litigation with a vengeance.").

To support its challenge to the 363 sale and the adversary proceedings, Matrix repeatedly sought to establish that Stylemaster induced it to continue selling plastic molds on credit, so that Stylemaster, ANB and Gateway, in no particular order, could build up Stylemaster's inventory, destroy Matrix's liens, put Stylemaster into bankruptcy and sell the company's assets to J.R Plastics at discount prices. ANB, according to Matrix, engaged in improper conduct when it: improperly extended credit to Stylemaster despite its insolvency; knew of Matrix's possessory liens but ignored them; and concealed from Matrix the existence of the bank's superior liens. Through this conduct, ANB was allegedly aware of and participated in Stylemaster's scheme, which supported Matrix's theory of equitable subordination in the adversary proceeding. Gateway and its executives, Matrix claims, colluded with Stylemaster and ANB to carry out the alleged fraudulent schemes, which was the primary reason Matrix sought to set aside the 363 sale of Stylemaster's assets to J.R. Plastics during the bankruptcy proceedings.

These allegations are similar to those in this case, although Matrix modified them to support claims for fraud and RICO. As in the bankruptcy proceedings, an essential element of Matrix's fraud and RICO claims in this case is that ANB and Gateway participated in various schemes to defraud Matrix and other suppliers. Matrix, in this case and in the underlying bankruptcy proceedings, spells out in detail the purported schemes and the Defendants' involvement in those schemes. Without introducing these allegations, Matrix's claims are difficult to discern. Thus, since Matrix relies on the same evidence to establish its claims in both proceedings, the Court finds that the claims are identical for purposes of *res judicata*. See Matthews v. U.S. Small Bus. Admin., 28 F.3d 1216 (7th Cir. 1994) (finding same claims where

plaintiff relied on nearly the same factual allegations); Smith v. City of Chicago, 820 F.2d 916, 918 (7th Cir. 1987) (holding that while a single group of factual allegations "may give rise to different claims of relief upon different theories of recovery, there remains a single cause of action" for *res judicata* purposes).

It is also important that under these same facts Matrix *could have* raised its fraud and RICO claims against ANB in the underlying proceedings. FED. R. CIV. P. 13(a) requires a party to state in its response to a complaint any counterclaim that it has against the complainant if the counterclaim arises out of the same transaction and occurrence that underlies the complaint. To determine whether two claims arise out of the same transaction and occurrence for purposes of Rule 13(a), the Seventh Circuit applies a "logical relationship" test. Kim v. Sara Lee Bakery Group, Inc., 412 F. Supp. 2d 929, 935 (N.D. Ill. 2006). As ANB points out, the purpose behind Rule 13(a) is judicial economy; "to avoid a multiplicity of actions by resolving in a single lawsuit all disputes that ensue from a common factual background." In re Price, 42 F.3d 1068, 1073 (7th Cir. 1994). In light of this purpose, the Seventh Circuit instructs the lower courts to liberally interpret the words "transaction or occurrence." Kim, 412 F. Supp. 2d at 935.

Matrix's claims in this case are clearly related to the claims it raised in the bankruptcy court, as they arose from the same common factual background through which Matrix challenged ANB's adversary complaint. The Court therefore agrees with ANB that Matrix was required to raise these claims as compulsory counterclaims in the adversary proceeding, but did not do so. This, in turn, left Matix's current claims open to preclusion. The Court will not reward Matrix for its failure to raise its claims in the bankruptcy court, for a litigant that wants to avoid a later defense of preclusion should bring its compulsory counterclaims in the first instance. See Publicis Communication v. True North Communications, Inc., 132 F.3d 363, 365 (7th Cir. 1997)

(discussing the relationship between Rule 13(a) and *res judicata*); Crop-Maker Soil Servs., Inc. v. Fairmont State Bank, 881 F.2d 436, 439-40 (7th Cir. 1989) (choosing not to return to claims that could have been raised in the bankruptcy court based on *res judicata*); Ross v. Bd. of Educ. of Tp. High Sch. Dist. 211, No. 05 C 6111, 2006 WL 695471, at *9 (N.D. Ill. Mar. 14, 2006) (stating that the definition of compulsory counterclaim "mirrors the condition that triggers a defense of claim preclusion" if a claim was left out of a prior suit.); CIVIX-DDI, LLC v. Expedia, Inc., No. 04 C 8031, 2005 WL 1126906, at *3 (N.D. Ill. May 2, 2005) ("Rule 13(a) promotes judicial economy by avoiding multiple actions involving disputes arising from a common factual background.").

In response, Matrix says nothing about its fraud claim, but instead argues that its RICO claim had not yet matured at the time Matrix answered ANB's adversary complaint, and thus it did not qualify as a compulsory counterclaim. Matrix does not dispute that a claim that could have been brought in the bankruptcy proceeding is barred by *res judicata* in a subsequent action, even if it is later styled as a RICO claim. In re Matter of Met-L-Wood Corp., 861 F.2d 1012, 1016 (7th Cir. 1988) (Posner, J.). Rather, Matrix maintains that its RICO claim had not accrued, because the claim is based on conduct by ANB that took place before and *after* ANB filed its adversary proceeding. To support this theory, Matrix alleges two predicate acts of racketeering that post-date the adversary proceeding. The first is Matrix's injury as a result of the adversary proceeding, and the second is correspondence sent by ANB that allegedly memorialized a fraud upon the bankruptcy court. See Pl.'s Resp. at 23. But neither of these allegations constitutes the "new" and "continued" wrongful acts necessary to relieve Matrix of its obligation to raise its RICO claim as a compulsory counterclaim in the adversary proceeding. In re Matter of Met-L-

Wood Corp., 861 F.3d at 1016 ("RICO is many things, but it is not an exception to *res judicata*.").

As ANB points out, Matrix's RICO claims are based for the most part on alleged predicate acts that occurred prior to the adversary proceeding. And, on the evidence presented, Matrix cannot establish as a matter of law that its post-adversary injuries and the additional correspondence constitute acts of mail fraud, extortion or a pattern of racketeering. In short, the post-adversary conduct by ANB was and is not actionable, even if we view it in light of ANB's pre-adversary conduct.

The additional correspondence to which Matrix refers is a letter by ANB sent on September 4, 2002, stating that it did not own the "Lien Rights Claim" to the molds in Matrix's possession. Matrix cites this letter in the amended complaint to support its theory that ANB was not a party of interest to the adversary proceeding and therefore the bankruptcy court lacked subject matter jurisdiction over its adversary claim. This, according to Matrix, was all part of the alleged scheme. Matrix intends to use those same jurisdictional allegations, with an added correspondence, to assert a collateral attack on the bankruptcy court's judgment in the form of a RICO action. But what may have supported a claim for lack of subject matter jurisdiction in the prior case, may not support a claim for RICO in this case. Cf. U.S. v. County of Cook, Illinois, 167 F.3d 381, 388 (7th Cir. 1999) (citing Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 702 n.9 (1982) ("A party that has had an opportunity to litigate the question of subject-matter jurisdiction may not...reopen that question in a collateral attack upon an adverse judgment.")). As the Seventh Circuit explained, RICO is a compound offense "made up of many 'claims,' each of which may be barred by omission in earlier litigation...." See Mortell v. Mortell Co., 887 F.2d 1322, 1325 (7th Cir. 1989) (Easterbrook, J.) (noting that if

claim preclusion would knock out the contention that the defendant committed fraud, the RICO claim itself would fail.). Accordingly, Matrix's alleged "continuing" activity does not constitute actionable conduct by ANB after the adversary proceeding was filed, and thus the additional allegations do not save Matrix from claim preclusion in this case.

Moreover, if the Court allows Matrix's RICO claims to go forward in this case, such a ruling would unquestionably impair ANB's and Gateway's rights that the bankruptcy court established in the adversary proceeding and in the 363 bankruptcy sale. Our principles of judicial economy require that *res judicata* bar a party's claim when its prosecution would nullify rights that were previously established in earlier proceedings. See Henry v. Farmer City State Bank, 808 F.2d 1228, 1232-1233 (7th Cir. 1986). However, *res judicata* not only safeguards judicial economy, but it also preserves the integrity of judgments and protects those who rely on them. Id. at 1233 (citing Martino v. McDonald's Sys., Inc., 598 F.2d 1079, 1085 (7th Cir. 1979)). These policy concerns cannot be underestimated.

Matrix further claims that *res judicata* does not apply in this case because of the "declaratory judgment exception," which precludes *res judicata* when the relief sought in the prior action was solely declaratory. Here, Matrix argues that ANB completely withdrew its claim for injunctive relief in the adversary proceeding, and thus the only relief ANB sought was a declaratory judgment. This hardly merits any reaction by this Court. Giving Matrix the benefit of doubt, and assuming it is not trying to mislead the Court, Matrix fails to realize that although ANB withdrew its motion for a *preliminary* injunction, it did not withdraw its request for a *permanent* injunction. The adversary proceeding was not limited to declaratory relief and thus the "declaratory judgment" exception does not apply. Nothing in the record supports Matrix's argument, and *res judicata* applies in this case.

### 2. *Final Judgments on the Merits*

Finally, for *res judicata* to apply ANB and Gateway must demonstrate that the bankruptcy court issued a final judgment as to the underlying collusion and fraud that allegedly took place. For this, the Court turns to the bankruptcy courts' prior opinions.

First, as we set forth above, at the conclusion of the hearing on Matrix's challenge to the 363 bankruptcy sale, the bankruptcy court found that the sale was conducted in good faith, without collusion and without any fraud. Recall that the thrust of Matrix's motion to reconsider the sale confirmation was that J.R. Plastics was not a good faith purchaser of Stylemaster's assets because of the fraud and collusion that took place prior to the bankruptcy and eventual sale. See Def.'s Memo., Ex. 2, Mot. for Reconsideration. To support this argument, Matrix specifically referred its counterclaim against ANB in the adversary proceeding and outlined the "fraudulent scheme" perpetrated by Stylemaster and its managers. See id. ¶ 9. After hearing oral argument on the issue, the bankruptcy court stated that during the sale proceedings it had been "sensitive to the possibility of collusion," Ex. 4, Hr'g Tr. at 31, but that Matrix's allegations did not "tend to show in any way that the court was defrauded" during the sale. Id. at 37. The bankruptcy court, in the end, found that "Matrix has not shown or alleged any evidence of fraud or collusion" in the sale process, that surprisingly Matrix did not offer any evidence of fraud at an earlier point in the sale process, and that Matrix's motion did not have "one breath of merit in it." Id. at 39-40, 44-45.

Even more striking is the bankruptcy court's opinion with regard to Matrix's equitable subordination defense in the adversary proceeding. In its opinion the bankruptcy court set forth the principles of equitable subordination, noting that it may subordinate a creditor's claim to those of other creditors if the superior creditor (ANB) "has engaged in misconduct, such that the

21

principles of equity would be offended if its claim were given parity with the other claims." In re S.M. Acquisitions, 332 B.R. at 352 (quoting Koch Refining v. Farmers Union Central Exchange, 831 F.2d 1339, 1350 (7th Cir. 1987)). In other words, it is essential for subordination that the creditor with a superior claim engage in some type of unfair or inequitable conduct that results in an injury to the other creditor. See In re S.M. Acquisitions, 332 B.R. at 353 (citing In re Mobile Steel Co., 563 F.2d 692, 700 (5th Cir. 1977)). Knowing this, Matrix tried to show ANB's misconduct by arguing that it ignored the financial problems between Stylemaster and Matrix and that ANB's due diligence with regard to Matrix's liens was inadequate. In re S.M. Acquisitions, 332 B.R. at 356 (recounting Matrix's arguments). But the bankruptcy court found no misconduct on behalf of ANB. Instead, the bankruptcy court stated that "the Bank's foregoing efforts to protect its collateral were not either such degree of control or any type of egregious conduct that might support subordination of its loan." In re S.M. Acquisitions, 332 B.R. at 355. And even assuming ANB was a Stylemaster insider, the bankruptcy court found that Matrix's claims "did not show misconduct sufficient to subordinate [ANB's] claim." Id. at 356. In short, said the bankruptcy court, "facts are not pleaded [by Matrix] and cannot be proven that demonstrate malevolent rather than ordinary business purposes in [ANB's] dealing with [Stylemaster]." Id.

On appeal, the district court scoured the record for the type of unfair dealings (e.g. fraud, illegality or breach of fiduciary duties) on behalf of ANB that would validate Matrix's defense. It found none. Although it disagreed with the bankruptcy court on the limited issue of whether ANB was a Stylemaster insider, the district court agreed with the bankruptcy court's assessment of the evidence. Specifically, it stated, "We agree with the bankruptcy court's conclusion that this alleged behavior, if proven true, would not constitute inequitable conduct on par with 'fraud,

22

spoliation, mismanagement or faithless stewardship.'" In re S.M. Acquisition, No. 05 C 7076, 2006 WL 2290990, at *7 (N.D. Ill. Aug. 7, 2006) (quoting In re Octagon Roofing, 157 B.R. 852, 898 (N.D. Ill. 1993)). The bankruptcy court wrote off ANB's inadequate due diligence as a business risk that ANB chose to assume; it was not, as Matrix claimed, an unfair dealing. In re S.M. Acquisition, 2006 WL 2290990 at *8. With that, the district court held that Matrix failed to allege facts sufficient to show that ANB participated in Stylemaster's fraud. Id.

This is not to say that Matrix did not allege fraud at all, as Matrix would have us believe. Matrix, in its response, cites to the district court's express language and argues that the opinion somehow establishes that Matrix's equitable subordination claim did not assert fraud against anyone. Resp. at 5. This argument is unavailing, however, since Matrix could not establish equitable subordination if it did not allege fraud or misconduct on behalf of ANB, much less "anyone." The district court's opinion acknowledged that Matrix did, in fact, assert fraud and misconduct on behalf of ANB, but that the facts it presented to support its assertion would not under any circumstances constitute fraud. So much is clear. Matrix has misconstrued the district court's express language.

Through these opinions, the bankruptcy court and the district court issued final judgments as to whether Matrix's allegations of fraud or misconduct supported its objections to the 363 bankruptcy sale and ANB's adversary proceeding. Those courts ultimately found that Matrix's assertions could not support a claim of fraud or misconduct in either proceeding. With that, ANB and Gateway have established the third and final element for *res judicata*. The Court therefore finds that Matrix is barred from raising not only those issues that were actually decided in the bankruptcy proceedings, but also those issues that Matrix could have raised during those proceedings. As it turns out, fraud and RICO would fall into this category.

## C. COLLATERAL ESTOPPEL (ISSUE PRECLUSION)

ANB and Gateway further maintain that Matrix's claims are precluded under the doctrine of collateral estoppel because the bankruptcy court and the district court previously determined in the adversary proceeding and the 363 sale that the parties did not engage in fraudulent or inequitable conduct. These rulings according to the Defendants would necessarily bar Matrix's claims of fraud in this Court. And as to Matrix's RICO claim, Gateway maintains that these judgments bar Matrix from asserting any fraudulent activity in this case, on the same facts, which is a necessary element of its RICO claim. The Court agrees with the Defendants on these points.

Under the doctrine of collateral estoppel, "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive of subsequent suits based on a different cause of action involving a party to the prior litigation." Chi. Truck Drivers, Helpers & Warehouse Union (Indep.) Pension Fund v. Century Motor Freight, Inc., 125 F.3d 526, 530 (7th Cir. 1997). The doctrine therefore applies where: (1) the issue previously decided is identical to the issue in the current suit; (2) there was a final judgment on the merits; (3) the party against whom estoppel is asserted was a party to the prior action; and (4) the factual issue has actually and necessarily been litigated and determined in the prior action. Washington Group Int'l, Inc. v. Bell, Boyd & Lloyd LLC, 383 F.3d 633, 636-37 (7th Cir. 2004); Hukic v. Aurora Loan Serv., Inc., No. 05 C 4950, 2007 WL 2563363, at \*9 (N.D. Ill. Aug. 31, 2007).

One of the primary issues in this case with regard to Matrix's fraud and RICO claims is whether the Defendants engaged in fraudulent conduct in order to obtain lien priority over Stylemaster's assets to Matrix's detriment. ANB claims that this issue was identical to the issue that the bankruptcy court determined in the underlying proceedings, and thus Matrix is barred

24

from raising it again here. As stated previously, the bankruptcy court previously held that Matrix's allegations were insufficient to demonstrate misconduct on behalf of ANB, when Matrix sought to equitably subordinate ANB's UCC lien to that of Matrix's tool and die lien. Furthermore, after the hearing on Matrix's challenge to the 363 sale, the bankruptcy court held that Matrix's allegations were insufficient to demonstrate fraud on behalf of Gateway and others when those parties sought to further a scheme that ended with J.R. Plastics purchasing Stylemaster's assets. These rulings not only nullify Matrix's claims with regard to fraud, but they belie the existence of any criminal or fraudulent conduct that would necessarily serve as the predicate acts for a RICO claim. Matrix asserted and alleged fraud at every turn in the bankruptcy proceedings, in the adversary action and on appeal. The judges that reviewed Matrix's claims continually denied the existence of any fraud on behalf of ANB and Stylemaster's shareholders. Matrix cannot avoid the preclusive effect of these judgments by simply recharacterizing its claims as fraudulent concealment and RICO in this Court. The Court therefore finds that issue preclusion applies, and grants the motions in favor of the Defendants.

## III. CONCLUSION

For the reasons stated above, the Court finds that Plaintiff Matrix IV, Inc.'s claims in this case are barred by the doctrines of *res judicata* and collateral estoppel. Because the Court need not decide whether Matrix's fraudulent concealment claim against ANB is barred by the five-year statute of limitations, it declines to address that argument in this Opinion and Order. Accordingly, the Defendant American National Bank's motion for judgment on the pleadings is granted and the Defendant Gateway Park, LLC's motion to alter is also granted.

IT IS SO ORDERED.

ENTER:

CHARLES R. NORGLE, Judge
United States District Court

DATED: _____ 10-15-08